UNITED STATES of America, Appellant,

v.

Louis A. CHEMELL, Esther Belle Chemell, Louis Dodd and Vivian K. Dodd, Appellees.

No. 16376.

United States Court of Appeals Fifth Circuit.

May 17, 1957.

George T. Lynch, Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., James W. Dorsey, U. S. Atty., Charles D. Read, Jr., Asst. U. S. Atty., Atlanta, Ga., for appellant.

Randolph W. Thrower, Atlanta, Ga., Joe K. Telford, Gainesville, Ga., for appellees, Telford, Wayne & Smith, Gainesville, Ga., Sutherland, Asbill & Brennan, Atlanta, Ga., of counsel.

Before HUTCHESON, Chief Judge, and BORAH and JONES, Circuit Judges.

JONES, Circuit Judge.

In actions for Federal income tax refunds the District Court for the Northern District of Georgia determined by judgments entered upon jury verdicts that the plaintiff taxpayers were, during the years 1948 and 1949, farmers within the meaning of Sec. 29.22(a)–7, Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939. The United States has appealed and is claiming that the facts disclosed by the record show that the taxpayers were not farmers within the meaning of the regulations and that the district court should have entered judgments dismissing the complaints, the verdicts of the jury notwithstanding. Louis Chemell and his wife filed a joint return for each of the two years in question as did Louis Dodd and his wife.

Louis Chemell and Louis Dodd were partners in the Gainesville Replacement Hatchery. Chemell and another were partners in the Georgia Broiler Hatchery. Both partnerships were organized in 1948. The business of the Replacement Hatchery was, in essence, the hatching and raising of poultry breeding stock for the Broiler Hatchery. After the hatching of chicks at the Replacement Hatchery they were distributed to numerous farms under arrangements with the farm owners to keep them for a growing period of ten or eleven weeks. Approximately fifty farms were participants in such arrangements in 1948. Some of the agreements under which this part of the operations was conducted were written but more of them were oral. The Hatchery supplied the materials for building chicken houses and in some instances the chicken houses became and remained the property of the Hatchery. Each owner undertook to raise five or six batches of chickens at a time. Profits from this phase of the program were divided between the several owners and the Hatchery. Any loss was to fall upon the Hatchery. The operations were conducted under the supervision of the partners in the Hatchery or their employees. After the growing period the birds were transferred elsewhere and permitted to range for a period of about fourteen weeks. The Hatchery caused oats to be planted to provide a portion of the feed for the poultry at this stage. At the end of this fourteen-week period the pullets reached an egg-laying age. Their eggs were sent to the Broiler Hatchery except a particularly fine clutch which was saved for the Replacement Hatchery. The chicks hatched at the Broiler Hatchery were sold when they were a day old with guarantees that 98% of them would live two weeks and that they would be free from those diseases which are transmitted through the egg. If surpluses developed in the market for broiler chicks the Broiler Hatchery would raise some of its stock for later marketing. Dodd usually spent two days a week at the Hatchery and the remainder on various farms. Chemell spent the better part of his time at the

hatcheries but was at and around the farms a good deal.

Chemell and Dodd, in preparing their Federal income tax returns for the years involved, computed their income from the hatchery operations by a cash receipts and disbursements method, claiming the right to do so under the Regulation providing that:

"A farmer may make his return upon an inventory basis instead of the cash receipts and disbursements basis. It is optional with the taxpayer which of these methods of accounting is used, but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method is authorized by the Commissioner as provided in section 29.41–2". Reg. 111, Sec. 29.-22(c)–6, T.D. 5683, C.B. 1949–1, p. 52.

The Regulations defined "farm" and "farmers" in these terms:

"As used herein the term 'farm' embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit, and truck farms; also plantations, ranches, and all land used for farming operations. All individuals, partnerships, or corporations that cultivate, operate or manage farms for gain or profit, either as owners or tenants, are designated as farmers. * * " Reg. 111, Sec. 29.22(a)–7.

The Commissioner took the position that the operation of the hatcheries was not farming, but was rather an industrial enterprise primarily producing chicks as items of merchandise and hence within the provision of that section of the Regulations which provides:

"In order to reflect the net income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * * " Reg. 111, Sec. 29.22(c)–1.

Income tax deficiencies were assessed and paid, claims for refund were made and rejected, and actions for the recovery of the amounts were brought. The actions were consolidated for trial. In addition to the testimony of Chemell and Dodd, they introduced as witnesses nine of those with whom they had agreements for the keeping of the chicks, who testified as to the operations of the hatcheries, as well as to the activities of Chemell and Dodd on the farm properties. Chemell and two others, one of whom was the Executive Secretary of the American Poultry and Hatchery Federation, and the other a teacher in the College of Agriculture of the University of Georgia, testified as to the operations being farming. The Government offered no evidence. The court denied the Government's motions for directed verdicts and submitted to the jury special interrogatories whether the partnerships were farmers within the meaning of Sec. 29.-22(a)–7. The jury returned affirmative answers.

██ The Government contends that the term "farmer" must be interpreted in its ordinary sense and, so interpreted, it refers to persons engaged in tilling the soil, and in raising and marketing crops, dairy products and livestock as a part of the farm economy. The arranging for and the supervising of the care and growth of chicks, the Government concedes, might be of an agricultural nature but here such activities were but an incident of what the Government urges was a commercial and industrial activity by mechanical means. In the charge to the jury the court stated the provisions of the statute and the regulation. The court then instructed the jury:

"Now, the historical or classical definition of farming is limited to the growing of crops and the tilling of the soil. The plaintiffs make no contention that they were growing crops and tilling the soil and they do not come within this narrow definition of farming. The regulation of the Commissioner and modern

usage, however, extend the definition of farming beyond growing crops and tilling the soil, 'Farming' within the meaning of the regulations includes such things as dairy farming, raising livestock, including poultry, pigs and cattle, maintaining a nursery for growing plants, or growing flowers as a florist.

"Plaintiffs contend that their activities constitute the raising of poultry in the ordinarily accepted sense and that they, therefore, were farming. If you find that their activities do amount to the raising of poultry, and that in so doing they were farming in the ordinary accepted sense, then you will find for the plaintiffs on this issue. If not, you will find for the defendant, the United States, on this issue.

"Now the plaintiffs have testified that all of their chicken and hatchery operations are part of a single undertaking to produce broiler chicks for sale. If you believe this testimony, then you would take all of these operations into consideration in deciding whether they amount to the raising of poultry.

"Now the defendant in these cases contends that the plaintiffs, in 1948 and 1949, did not own or lease any farm lands, and contends that for this and other reasons they could not be considered farmers. The plaintiffs have presented testimony in an effort to show that they regularly leased and rented farm lands for the growing of chickens, also that they owned large numbers of chickens, and that they entered into agreements with farmers for the care of such chickens under the directions of the plaintiff, and at least one of the witnesses has described the arrangement as being a partnership.

"Now to be considered to be farming or raising poultry, it is not necessary for a taxpayer to show that he did everything that was done in the raising of the poultry, but he must show that he did participate and took part in the raising of the poultry, and that his activities in this regard were substantial and regular rather than irregular and unsubstantial. Things done by plaintiffs' partners or employees on behalf of plaintiffs should be considered as activities of the plaintiffs.

"If you believe the testimony, and find that these activities were extensive and constituted an important part of plaintiffs' regular operations, then this would authorize you to find that the plaintiffs were engaged in raising poultry, and if you decide that this was farming within the commonly accepted meaning of that term, then this evidence would authorize you to so find.

"Now the plaintiffs have presented testimony, including expert testimony, to show that each part of their operation was agricultural, and that the incubation and hatching of eggs and the care and handling of baby chicks are necessary functions in the raising of poultry. This testimony, if believed, would authorize you to find that the plaintiffs are raising poultry as they contend."

To these instructions no exceptions were interposed by either the taxpayers or the Government. The instructions have been characterized as "excellent". Mertens, Law of Federal Income Taxation, March 1957 Supplement, p. 66, § 12.136. The jury was justified in finding, as it did find, upon the evidence before it and under the court's instructions, that the taxpayers were engaged in farming within the meaning of the quoted regulation. The issue before us, as tendered by the Government, indirectly challenges the correctness of the instructions. The precise question has not, apparently, been considered in an income tax case. It being the central issue in the case we may consider it under the general rule which allows an appellate court to notice plain errors even though they were not properly excepted to in the district court. Louisiana & Arkansas R. Co. v Moore, 5 Cir., 1956, 229 F.2d 1, United States v. Sellers, 5 Cir., 1935, 75 F.2d 623. If

the court made no error in overruling the Government's motions for a directed verdict and for a judgment non obstante, and if there was no plain error committed in the giving of the instructions, the appellees are entitled to an affirmance.

Factually, the case nearest in point to that before us is Miller Hatcheries v. Boyer, 8 Cir., 1942, 131 F.2d 283, 284. There an employee of a commercial chicken hatchery brought an action under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. for the difference between the wages prescribed by the Act and those which he was paid, and successfully contended before the district court that his employer was not engaged in " 'the raising of * *. * poultry' " within the meaning of the statute and hence he was not excluded from its benefits as one " 'employed in agriculture' ". Boyer v. Miller Hatcheries, Inc., D.C. S.D.Iowa 1941, 42 F.Supp. 135. The Court of Appeals reversed. Its decision was based, for the most part, on contemporaneous administrative interpretations. In so holding, the court said:

"Congress may well have intended that hatchery operations, in their now common relationship to poultry raising by farmers, should be treated as so intimately and directly connected with farming activities as to constitute one of the exempt processes of agriculture." 131 F.2d 287.

Under the Social Security Act "agricultural labor" at one time expressly included services in connection with the hatching of poultry. 53 Stat. 1386. Subsequently it was provided that such services were agricultural only if performed on a farm. 64 Stat. 532, 26 U.S.C.A. (I.R.C.1939) § 1426, U.S.Code Cong. Service 1950, p. 3384.

The Tax Court has recently held that the operation of a nursery was farming. In rejecting the Government's contention that the nursery was more analogous to a retail store than to a farm, the Tax Court stated the purpose of the regulation in these words:

"Respondent [Commissioner of Internal Revenue] has been lenient in his regulations governing the methods of accounting of farmers because of the difficulty of maintaining inventory records of growing crops and the unpredictable effect of nature. Consequently, a farmer is allowed to choose either the cash or accrual basis, his election thereby becoming binding." Stokes, 22 T.C. 415, 424.

The record before us indicates that there might be as great, and perhaps greater, risks from the unpredictable effect of nature in the growing of chicks as in the growing of grains. Administrative rulings have referred to a nurseryman, I.T. 1368, I–1 C.B. 72, and a florist, O.D. 995, 5 C.B. 63, as farmers. The growing of mushroom spawn in test tubes and bottles, Rev.Rul. 56–560, I.R.B. 1956–45, p. 14, and the growing of mushrooms in a cave, Rev.Rul. 57–41, I.R.B. 1957–5, p. 24, are held by the Internal Revenue Service to be farming within the meaning of the Federal Insurance Contributions Act, 26 U.S.C.A. (I.R.C. 1954) § 3101 et seq.

The Government stresses the urban character of the enterprise but such may be also true of the growing of mushroom spawn, nursery stock and flowers. The Government places emphasis upon the mechanical phases of the hatching of eggs but many phases of farming are now heavily mechanized. Mechanical planters put into the ground the seed of grain, the eyes of potatoes and the seedling tree. There are mechanical combines for the reaping and threshing of grains, mechanical diggers for potatoes and mechanical pickers for cotton. The term "farm", by the definition of the regulations, includes poultry farms. The maintaining of a flock of hens producing eggs to be hatched into chicks and the growing of feed are agricultural pursuits and are parts of an integrated operation. The Government submits that these portions of the taxpayers' activities were minor and incidental. The taxpayers insist that their activities in connection with the breeding and raising of their own laying flocks were essential and were a major and important part of their chick hatching

business. We think the evidence sustained the taxpayers' position. The court's instructions were, and this is indicated by the Government's acceptance of them, as favorable to the Government as it could desire. The judgment entered upon the jury's verdict is free from error. It is

Affirmed.